UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ST. TAMMANY PARISH TAX COLLECTOR          CIVIL ACTION

VERSUS                                    NO.  05-5695

BARNESANDNOBLE.COM, ET AL.                SECTION "R" (3)

### ORDER AND REASONS

This is an action for collection of sales and use taxes under Louisiana law.  The parties have agreed to submit the case to the Court for decision on the stipulated record.  For the following reasons, the Court FINDS for the DEFENDANT.

**I.    BACKGROUND**

Defendant barnesandnoble.com, LLC ("Online") is an internet retailer of books, movies, and music at the internet address www.barnesandnoble.com.  The company accepts orders from customers across the country, including in St. Tammany Parish, and fills these orders through a national distribution system

that has no physical presence in Louisiana except for the use of common carriers to deliver merchandise from out-of-state that was ordered online.  During the period in question in this case, January 2001 through December 31, 2005, the company did not maintain a mailing address or telephone number in the State of Louisiana.  It had no employees in Louisiana and owned no tangible property in the State.

From January 2001 through October 2003, Barnes & Noble, Inc. owned 40% of Online.  Between October 2003 and May 2004, Barnes & Noble, Inc. owned 80% of Online through a wholly-owned subsidiary.  Between May 2004 and December 31, 2005, Barnes & Noble, Inc. owned 100% of Online through a wholly-owned subsidiary, B&N Holding Corp.

During the period at issue, Barnes & Noble, Inc. also wholly owned Barnes & Noble Booksellers, Inc. ("Booksellers"). Booksellers owned and operated retail stores throughout the country, including one in St. Tammany Parish, under the brand name "Barnes and Noble."  The Booksellers retail outlet in St. Tammany Parish was located in the City of Mandeville.  Although the two companies were both owned, in whole or in part, by the same parent corporation, Booksellers and Online did not share management, employees, offices, and other important elements of their businesses.

On October 31, 2005, the St. Tammany Parish Tax Collector sued defendants in Louisiana state court on behalf of various taxing jurisdictions within the Parish for sales and use taxes that Online allegedly failed to collect during the tax period. On November 16, 2005, defendants removed the case to this Court. The parties cross-moved for summary judgment, and on January 17, 2007, the Court held oral argument on the issues raised in the cross-motions.  At the hearing, the parties agreed to submit the issue for trial on the briefs and the stipulated record.

## II.  LEGAL STANDARD

The parties have agreed to convert their motions for summary judgment into a trial on the briefs and the stipulated record. The Court therefore uses the legal standard applicable at trial, not the summary judgment standard.  Plaintiff therefore bears the burden of proof by a preponderance of the evidence.

## III. DISCUSSION

### A.   Substantial Nexus

Before it may impose a tax on an out-of-state entity, a state or local jurisdiction must establish that the imposition of the tax is consistent with the Commerce Clause of the Constitution.  *See Quill Corp. v. North Dakota*, 504 U.S. 298, 305

(1992).  The state must show that the "tax [1] is applied to an activity with a substantial nexus with the taxing state, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State."  *Id.* at 311 (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977)).  This case involves only the first of these requirements.

In *Quill*, *supra*, the Supreme Court reversed a state court's ruling that upheld the imposition of sales and use taxes on a mail-order business without a physical presence in the state.  504 U.S. at 301-02.  Employing the "substantial nexus" test, the Court inquired whether the vendor had enough contacts with the taxing state to justify the state's interference with interstate commerce.[1]  The Court held that "a vendor whose only contacts

_____

[1] The Supreme Court in *Quill* also discussed a separate substantial nexus test derived from the Due Process clause of the Fifth and Fourteenth Amendments.  *Quill*, 504 U.S. at 305-08. That test asks whether the company at which the tax is aimed has purposefully directed its activities at the forum jurisdiction, whether the magnitude of its contacts meet a minimum standard to justify jurisdiction, and whether the tax is related to the benefits received from the state or jurisdiction.  *Id.* at 308. As the Court indicated in Quill, a tax can satisfy the Due Process Clause test but fail the Commerce Clause test.  *Id.* at 305.  Because the Court finds that Online did not have a substantial nexus with the Parish for purposes of satisfying the dormant Commerce Clause, the Court does not reach the issue  of whether the imposition of a sales and use tax collection requirement on Online during the taxing period would also violate Due Process.

with the taxing State are by mail or common carrier lacks the

'substantial nexus' required by the Commerce Clause."  Quill, 504

U.S. at 311; *see also Nat'l Bellas Hess, Inc. v. Dept. of Revenue*

*of State of Ill.*, 386 U.S. 753, 758 (1967), *overruled in part and*

*on other grounds by Quill*, 504 U.S. 298.  The Court noted that

the test draws a "sharp distinction . . . between mail-order

sellers with [a physical presence in the taxing] State and those

. . . who do no more than communicate with customers in the State

by mail or common carrier as part of a general interstate

business."  *Quill*, 504 U.S. at 311 (quoting *Nat'l Geographic Soc.*

*v. Cal. Bd. of Equalization*, 430 U.S. 551, 559 (1977)).  Although

it acknowledged that the ability to "tax may turn on the presence

in the taxing state of a small sales force, plant, or office,"

the Court noted that the existence of a bright-line rule in this

area of the law provides benefits that outweigh the seeming

"artificiality" of the rule.  *Quill*, 504 U.S. at 315-16.  The

Court in *Quill* specifically reaffirmed the bright-line, physical

presence rule first enunciated in *Bellas Hess*, 386 U.S. at 758-

60.  *Quill*, 504 U.S. at 317-18.  The Court also stated that

advertising in national publications and licensing company-owned

software to in-state clients was insufficient to create the

requisite nexus.  *Id.* at 313 n.6, 315 n.8.  The Court noted that

it rejected a "slightest presence" standard for constitutional

nexus.  *Id.* at 315 n.8.

In another set of cases, the Supreme Court articulated an attributional nexus test.  In *Scripto, Inc. v. Carson*, 362 U.S. 207 (1960), the Supreme Court held that a company may not avoid a sufficient nexus merely by classifying the parties that constitute the company's physical presence in the taxing jurisdiction as independent contractors.  *Id.* at 211.  *Scripto* involved an Atlanta company engaged in selling mechanical writing instruments.  *Id.* at 208-09.  The company contracted with ten advertising specialty brokers to solicit sales within the State of Florida.  *Id.*  The Court held that the physical presence of the brokers, who were actively soliciting on behalf of the company, constituted sufficient nexus for purposes of a use tax collection requirement.  *Id.* at 210-12.  The Court was concerned that allowing the constitutionality of imposing a tax to turn on the formal classification of the parties in a contract "would open the gates to a stampede of tax avoidance."  *Id.*  The Court reaffirmed this principle in *Tyler Pipe Industries, Inc. v. Wash. State Dept. of Revenue*, 483 U.S. 232, 250 (1987), holding that the applicability of tax requirements hinged on "whether the activities performed in [the taxing jurisdiction] on behalf of the taxpayer [were] significantly associated with the taxpayer's ability to establish and maintain a market . . . for the sales."

*Id.*  In that case, the out-of-state company's in-state sales representatives, working for an independent contractor, were the primary conduit between the company and its customers and potential customers in the State of Washington.  *Id.* at 249-50. As such, the activities of the independent contractor on behalf of the out-of-state company were enough to create a substantial nexus.  *Id.* at 250-51.  Attributional nexus thus arises when the presence of a person or entity in the taxing jurisdiction is attributed to another entity for purposes of establishing nexus. The Parish argues that the physical presence of Booksellers' store in Mandeville should be attributed to Online because Booksellers allegedly acted on Online's behalf within the taxing jurisdiction.

Specifically, the Parish cites five aspects of the business relationship between Online and Booksellers as evidence that a substantial nexus existed during the relevant period:

(1)   The companies offered a membership program in which customers paid an annual fee and received discounts on merchandise purchased from either company, and Online derived revenue from the annual fees.

(2)   Booksellers sold gift cards that were redeemable with Online and included Online's web address.

(3)   Online received commissions on merchandise ordered

at Booksellers retail stores but shipped directly

to the customer.

(4)   The two companies engaged in advertising on behalf

of each other.

(5)   Booksellers stores gave preferential treatment to

returns of merchandise purchased from Online.

According to plaintiff, these five characteristics of the

companies' relationship establish a substantial nexus between

Booksellers and Online.   The Court describes each of these

factors separately.


1.   The Membership Program

During the period in question, Online, Booksellers, and

several other retailers participated in a customer loyalty

program run by Barnes & Noble, Inc., the companies' parent

corporation.   (R. Doc. 33-5, Ex. A, ¶ 34).   Under the program,

customers purchased $25 memberships that entitled them to

discounts and other special offers from participating retailers.

*Id.* at ¶ 35.   The proceeds from the membership fees were

distributed by Barnes & Noble, Inc. among the participating

companies on a *pro rata* basis according to the percentage of

overall discounts under the program awarded by each company.   *Id.*

at ¶ 37.   Thus, Online did not receive revenue from sales made by

Booksellers, and Booksellers did not receive revenue from sales made by Online.  Further, neither company made sales or took orders for the other.

Both Booksellers and Online advertised and marketed the membership program within their respective arenas.  (R. Doc. 26-5, Dep. pp. 46-58).  This included advertising the availability of discounts from the other participants in the program.  In addition, the participants in the program shared all member names and e-mail addresses, which were used for direct marketing.  (R. Doc. 33-5, Ex. A, ¶ 39).


### 2.   Gift Cards

Online participated in a multi-retailer gift card program with several other retailers, including Booksellers.  In most relevant respects, the gift card program mirrored that of the membership program.  Gift cards were available and redeemable at Booksellers stores and at Online's website, as well as at other participating retailers.  (R. Doc. 26-8, Ex. B, Dep. pp. 65-67).  The promotional materials used by program participants, including Booksellers' Mandeville store, advertised that gift cards were redeemable at Online's website.  (R. Doc. 33-5, Ex. A, ¶ 33; R. Doc. 26-8, Ex. B, Dep. pp. 65-67).

Marketing Services (Minnesota) Corp., Inc. ("MSMC") administered the gift card program.  (R. Doc. 33-5, Ex. A, ¶ 30).

During the tax period, MSMC was a subsidiary of Barnes & Noble,
Inc., and was located outside Louisiana.  *Id.* at ¶ 30.  Under the
program, a participating company remitted the proceeds from the
sale of a gift card to MSMC in return for a fee.  *Id.* at ¶ 31.
Upon redemption of the card, MSMC would pay the retailer the face
value of the card.  *Id.* at ¶ 32.  Thus, a participating retailer
would interact only with MSMC and the customer in fulfilling its
obligations under the program.  The retailer would receive
revenue only upon sending the proceeds from the sale of a card to
MSMC or upon use of the card to purchase merchandise from that
retailer.  As with the membership program, a participating
retailer derived revenue only from selling gift cards directly to
customers or from accepting gift cards as payment for items
purchased from that retailer.  Participants therefore did not
derive revenue from sales made by other participating retailers.

      3.    Commissions on In-Store Sales

During the tax period, when a Booksellers store did not
carry an item requested by a customer, the customer could place
an order with a clerk and have the item shipped to the store for
pickup or directly to the customer.  (R. Doc. 26-5, Ex. A, Dep.
pp. 59-60).  The store would "source" the item through a computer
system that found the item among various wholesalers and
distribution centers, including Booksellers' own warehouses and

those of third-parties.  *Id.* at 60-61.  Booksellers' stores were not able to choose a particular source through the system, but the computer would determine the source in accordance with predetermined criteria such as price and proximity.  *Id.* at 106-08.  In some cases, the system sourced the order to Online's distribution centers, which shipped the item directly to the customer or to the Booksellers store.  *Id.* at 60-61.  Online charged Booksellers a wholesale price plus a commission for the purchase, and Booksellers would resell the item to the customer.  (R. Doc. 33-5, Ex. A, ¶ 41).  In filling these orders, Booksellers would collect any applicable state and local sales taxes.  *Id.*

### 4.   Cross-Promotional Advertising

The taxing authority relies on certain activity by Online that promoted Booksellers' stores.  Online's website provided a "store locator" to identify nearby locations.  (R. Doc. 26-8, Ex. B., Dep. pp. 79-80).  The website also provided information about events taking place at Booksellers retail stores, including the Mandeville store.  *Id.* at pp. 80-85.  The only evidence that Booksellers promoted Online during the tax period was in connection with their activities in advertising the multi-retailer gift and membership programs discussed, *supra*.  As the manager of the Mandeville store testified, store employees would

provide information about the website only if asked by a
customer.   (R. Doc. 26-8, Ex. B, Dep. p. 87).


> 5.   Returns

During the tax period, Booksellers stores accepted returns
of merchandise carried by Booksellers stores regardless of where
the merchandise was purchased.   (R. Doc. 33-5, Ex. A, ¶ 28).
Customers who had purchased items from Online could return an
item and, upon showing a receipt, receive store credit from
Booksellers for the amount paid to Online for the item.   (R. Doc.
26-5, Ex. A, Dep. pp. 22-24; R. Doc. 26-9, Ex. B, Dep. pp. 56-
57).   Online advertised this aspect of Booksellers' return policy
on its own website.   (R. Doc. 26-7, Exs. A, B).   Customers who
did not show a receipt – in effect, customers who could have
purchased the item from any retailer – received store credit in
the amount of the price of the item at that time in Booksellers'
store.   (R. Doc. 26-5, Ex. A, Dep. pp. 22-24).   Booksellers
accepted returns from other bookstores to encourage customer
satisfaction, entice new customers, and as a source of income.
(R. Doc. 33-5, Ex. C, ¶ 11).   The manager of the Mandeville store
testified that the decision as to whether to give a full refund
to a customer who presented a receipt from a retailer other than
Booksellers or Online, was within the discretion of the store
manager.   (R. Doc. 26-8, Ex. B, Dep. pp. 59-60).   She stated that

customers did not typically bring in receipts from competing

retailers, such as Books-a-Million, but that she would have given

a full refund to customers who did so in order to satisfy the

customer.  *Id.*


   **B.    Nexus Analysis**

     Considering the relationship between Booksellers and Online,

the Court concludes that Online did not have a substantial nexus

with the Parish.   The activities of Booksellers in St. Tammany

Parish on behalf of Online were not of the order of magnitude

necessary to establish that Booksellers marketed Online's

products on Online's behalf in the Parish.   The existence of a

close corporate relationship between companies and a common

corporate name does not mean that the physical presence of one is

imputed to the other.  *See, e.g., SFA Folio Collections, Inc. v.*

*Bannon*, 217 Conn. 220, 229-31 & 233-34 (1991) (refusing to impute

nexus from bricks-and-mortar retailer to mail-order retailer when

the retailers were separate corporate entities owned by the same

parent company, sharing some directors and officers, using the

same trademarks and logos, selling similar merchandise, and

sharing financial and market information); *Bloomingdale's By*

*Mail, Ltd. v. Pennsylvania*, 130 Pa. Cmwlth. 190, 198 (1989)

(holding that affiliation alone was insufficient to create

nexus); *SFA Folio Collections, Inc. v. Tracy*, 73 Ohio St.3d 119,

122-23 (Ohio 1995) (rejecting unitary business entity argument
that would impute nexus to affiliated, out-of-state retailer);
*Current, Inc. v. State Board of Equalization*, 24 Cal.App.4th 382,
391 (Cal. App. 1 Dist. 1994) (holding that nexus could not be
imputed between companies that did not have integrated operations
or management and were organized as separate and distinct
entities).  Booksellers and Online were formally separate
corporate entities that were wholly owned by the same parent
company for only part of the period in issue.  The two companies
clearly shared a common name and brand identity under the "Barnes
& Noble" banner, but there was no overlap between the companies'
management or directors.  There is no allegation that the
companies intermingled assets or that they were underfinanced.
And to the extent the companies may have shared financial or
market data, that fact is not of independent significance.  The
companies did not hold themselves out as the same entity.  Thus,
the Court finds that attributional nexus does not apply merely by
virtue of the affiliation between the companies.

     Further, the nature and extent of the activities performed
by Booksellers on behalf of Online within St. Tammany Parish were
insufficient to treat Booksellers as acting as a marketing
presence for Online in the Parish.  In *Tyler Pipe* and *Scripto*,
the Supreme Court was concerned that companies could avoid tax
obligations merely by reclassifying employees, such as

salespeople, as independent contractors.  In both cases, the out-
of-state concerns had in-state sales representatives acting
continuously on their behalf to solicit orders for sales to
customers.  Further, *Quill* established that the Court has not
adopted a "slightest presence" standard so that a *de minimis*
amount of property in the taxing jurisdiction does not suffice to
establish the requisite nexus.  *Quill*, 504 U.S. at 315 n.8.
Booksellers' activities were not tantamount to acting as a sales
presence for Online.  Booksellers has never taken or solicited
orders on behalf of Online and did not provide facilities to
place orders with Online.  The absence of such activity by the
in-state affiliate was significant in cases finding no nexus.
*See SFA Folio*, 73 Ohio St.3d at 123; *SFA Folio*, 217 Conn. at 228;
*Bloomingdale's*, 130 Pa.Cmwlth. at 197-98.  Further, the Parish
has not demonstrated that participation in the gift card and
membership programs, in which the revenue is divided on a *pro-
rata* basis among all participating retailers, can constitute the
sufficient nexus upon which to base tax liability.  Neither of
these programs produces revenue to Online by virtue of sales made
or orders taken by the entity that is physically present in the
Parish.  That Online may have derived a benefit from Booksellers'
advertising of the program is not sufficient to impute its
presence to Online.  For example, in both *SFA Folio Collections
v. Bannon* and *SFA Folio Collection v. Tracy*, the mail-order

retailers distributed their catalogs to the local stores for distribution to customers or for use in marketing.  *SFA Folio*, 73 Ohio St.3d at 123; *SFA Folio*, 217 Conn. at 228-29.  This sort of advertising creates a stronger case for nexus than the existence of promotional materials for a joint-discount or gift card program that mention the other participating retailers. Nevertheless, in the cited cases, this activity was insufficient to create the requisite nexus.  In addition, although the Parish argues that Online receives commissions from in-store sales, it is clear from the evidence that Online in fact is one of many wholesalers, including its competitors, from whom Booksellers sources items that it does not have in stock, to be shipped to the store or directly to the customer.  (R. Doc. 20-5, Dep. pp. 109-10).  There is no evidence that Booksellers treats Online any differently from other third-party wholesalers in its system. Further, the evidence shows that Booksellers treats this type of sale as its own sale and collects any applicable taxes.  In fact, Booksellers stores cannot even choose the source of these items, but instead relies on a computer system.  *Id.* at Dep. p. 107.

The final factor cited by the Parish is Booksellers' return policy.  Booksellers' return policy was preferential to Online in that Booksellers accepted Online's merchandise as if it were its own, whereas with other retailers, Booksellers' policy was to give store credit in the amount of the price of the item in

Booksellers' store at that time, although the local manager had
discretion to give full refunds if customers presented receipts
from other retailers.  Online advertised this benefit on its
website.  Both the *SFA Folio Collections v. Tracy* and
*Bloomingdale's By Mail v. Pennsylvania* courts rejected the
argument that a preferential return policy established
substantial nexus.  *SFA Folio*, 73 Ohio St.3d at 123;
*Bloomingdale's*, 130 Pa. Cmwlth. at 198.  This Court agrees with
the decisions of the Ohio and Pennsylvania courts in these cases.
The policy of Booksellers to accept returns according a slightly
more generous policy than the one extended to other retailers is
not comparable to an independent contractor making sales on
behalf of the out-of-state retailer, such as was involved in
*Scripto* and *Tyler Pipe*.  Nor is it comparable to the level of
sales or sales support activity undertaken by in-state agents in
other cases in which courts have found nexus.  *See, e.g., In re
Scholastic Book Clubs, Inc.*, 260 Kan. 528 (1996) (finding nexus
when out-of-state retailer effectively used Kansas teachers to
sell books to Kansas students); *Scholastic Book Clubs, Inc. v.
State Board of Equalization*, 207 Cal.App.3d 734 (finding nexus on
facts similar to Kansas case); *State v. Dell Int'l, Inc.*, 922
So.2d 1257, 1263-1266 (La. App. 1st Cir. 2006) (imputing nexus to
foreign computer retailer based on agreements with in-state
technical service provider under which service provider provided

computer support services on the foreign retailer's behalf and at

its direction, and those services were crucial to the retailer's

ability to sell its products); *Reader's Digest Ass'n v. Mahin*, 44

Ill.2d 354, 357-59 (Ill. 1970) (imputing nexus to parent

corporation because of its local advertising and solicitation for

advertisements in-state by its wholly-owned subsidiary).

Further, Booksellers initiated the return policy to generate

goodwill and to serve the convenience of its customers.  (R. Doc.

33-5, Ex. C, ¶ 11).  The only case to rely on a comparable return

policy to find nexus implied that a policy based on such

considerations would not be indicative of the requisite nexus.

*Borders Online v. State Board of Equalization*, 129 Cal.App.4th

1179, 1199 (Cal. App. 1 Dist. 2005).

Accordingly, considering all of the evidence adduced by the

Parish in support of its contention, the Court finds that a

substantial nexus does not exist upon which to base tax

liability.

**IV.   CONCLUSION**

For the reasons stated above, the Court FINDS for the

DEFENDANT.


New Orleans, Louisiana, this 22nd day of March, 2007.


_Sarah Vance_
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE